IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| McCABE HAMILTON & RENNY CO., LTD., | ) ) | CIVIL NO. 06-00514 SOM/LEK |
| | ) | |
| Plaintiff and Counterclaim Defendant, | ) ) | ORDER CONFIRMING IN PART AND REMANDING IN PART ARBITRATION AWARD |
| | ) | |
| vs. | ) ) | |
| INTERNATIONAL LONGSHORE AND WAREHOUSE UNION, LOCAL 142, AFL-CIO, | ) ) ) | |
| | ) | |
| Defendant and Counterclaimant. | ) ) | |
| _____ | ) | |

ORDER CONFIRMING IN PART AND REMANDING IN PART ARBITRATION AWARD

I.      INTRODUCTION

        Plaintiff McCabe Hamilton & Renny Co., Ltd. ("McCabe"),
moves to vacate the Arbitrator's Decision issued by Arbitrator
Ted Tsukiyama (the "Arbitrator") on June 22, 2006, in the
arbitration with Defendant International Longshore and Warehouse
Union, Local 142, AFL-CLO (the "Union").  The Union moves to
confirm the Arbitration Award.  The court denies McCabe's motion
to vacate the Arbitration Award, remands a calculation issue to
the Arbitrator, and denies the Union's request for prejudgment
interest.

II.     BACKGROUND

        In 1994, Quentin Tahara was employed by McCabe as a
winchman/crane operator in the Longshore Unit.  Tahara's position

was covered by two successive versions of a collective bargaining agreement ("CBA") known as the Longshore Agreement.  The court calls the first version the "1993-96 CBA," and the second the "1996-99 CBA."  Exs. 2 and 3 (attached to McCabe Motion).  The CBAs were in most respects the same and addressed grievance timelines, grievance procedures, and workplace safety. Section 18 of both CBAs, for example, provided for the Safety Code to "apply to operations performed by employees" and also set forth a procedure for the Union to complain of any change in operations that resulted in the "creation of unduly dangerous working conditions."  See 1993-96 CBA at 20; 1996-99 CBA at 20.  The 1996-99 CBA included an additional provision, section 18.02, which stated that "[t]he Employer agrees to provide safe working conditions and facilities and to maintain all equipment in safe working order."  See 1996-99 CBA at 20.

Both CBAs required grievances to be filed within fourteen days of an incident to avoid waiver of a remedy. Section 25.03 of the 1993-96 and section 24.01 of the 1996-99 CBA provided that "[t]he Employer will not be required to consider any grievance" not presented within fourteen calendar days from the incident or, if a continuing violation was at issue, fourteen calendar days following the date on which the last incident occurred.  See 1993-96 CBA at 22-23; 1996-99 CBA at 23.

Section 24.02 of the 1996-99 CBA stated that "[t]he positions of each party and the reasons therefore shall be stated in detail at each step of the grievance procedure."  Sections 24.04 to 24.06 set forth a three-step grievance procedure, after which arbitration could be pursued if the grievant was not satisfied with the result.  Section 24.07 required that the Notice of Intent to Arbitrate be in writing.  See 1996-99 CBA at 23.

Any grievance not resolved through the internal grievance procedure could be submitted to arbitrators selected by the parties from a panel set forth in the CBAs.  Section 25.06 of the 1993-96 CBA and section 24.09 of the 1996-99 CBA set forth the arbitrators' authority and limitations:  "All decisions of the Arbitrator shall be limited to the express terms and provisions of this agreement, shall be final and binding upon the parties hereto, shall be in writing, and a copy thereof shall be submitted to each of the parties hereto."  1996-99 CBA at 23; 1996-99 CBA at 24.

In March 1994, Tahara reported to a supervisor that another employee, Bruce Perry, had been clocking in and then leaving work without permission.  On March 30, 1994, Perry, apparently angered by Tahara's report, assaulted Tahara.  Tahara was seriously injured and permanently lost the sight in one eye. Union Motion at 15; see also Ex. 1 at 37-38.  McCabe suspended

3

Perry for three months and placed him on probation for a year. See Ex. 1 at 61; see also Ex. 4 (attached to McCabe Motion). After the suspension, Perry returned and worked for McCabe until his resignation in late 1996.  Ex. 13 at 3 (attached to Union Motion).

Tahara was on medical leave until June 6, 1994, after which he returned to work as a winchman.  However, Tahara's physical condition, as well as his concerns about his own safety given Perry's continued presence, led to Tahara's transfer to a wharf clerk position in the Wharf Clerk Unit from July 1994 to May 1995.  See Ex. 1 at 25-26 (attached to Union Motion); Ex. 30 at 4 (attached to McCabe Motion).

Meanwhile, criminal charges were brought against Perry, with Tahara cooperating with the Honolulu Police Department ("HPD") as a witness.  In May 1995, after consulting with McCabe, Tahara entered HPD's Witness Protection Program.  This, of course, meant he could no longer work at McCabe.  McCabe placed him on a leave of absence in light of the circumstances.  See Ex. 1 (attached to McCabe Motion) at 22-24.

On February 17, 1998, Tahara informed McCabe that he planned to return to work.  Ex. 13 (attached to Mccabe Motion). He reported to work on April 6, 1998, but was told by McCabe that he could not return to work until he accounted for his absence. McCabe Motion at 15-16.  Then, mistakenly concluding that Tahara

4

had left the Witness Protection Program long before 1998, McCabe sent Tahara a letter on April 20, 1998, telling him he was not being reinstated because he was deemed to have abandoned his job. Ex. 1 at 29-30 (attached to Union Motion); Ex. 2 at 25-26 (attached to Union Motion); Ex. 14 (attached to McCabe Motion).

On May 1, 1998, the Union filed a grievance (the "1998 Grievance") on Tahara's behalf challenging McCabe's refusal to reinstate Tahara. Ex. 15 (attached to Union Motion). The 1998 Grievance listed the dates of the alleged violation as April 6, 1998, and April 20, 1998. The 1998 Grievance alleged violations of four provisions. Although the Union did not cite section 18, the safety provision, it said it was reserving the right to cite additional provisions as the grievance was investigated. See 1998 Grievance.

Reconciliation efforts were unsuccessful, and the Union filed a Notice of Intent to Arbitrate on July 30, 1998 (the "1998 Notice of Arbitration"). Ex. 16 (attached to McCabe Motion). The 1998 Notice of Arbitration described the grievance as "pertaining to Termination of grievant" and "incorporate[d] by reference all prior allegations of the contractual violations and request for remedies and relief." See 1998 Notice of Arbitration.

On July 29, 1998, Tahara filed an Unfair Labor Practice Charge ("ULP") with the National Labor Relations Board ("NLRB")

5

against McCabe, alleging that McCabe had "terminated [Tahara's] employment because of union or protected activities . . . [and] because of his lawsuit against the union and the company."  Ex. 25 (attached to McCabe Motion).  The lawsuit referred to in the ULP was an April 1996 civil suit that Tahara had brought in state court against McCabe and other defendants alleging, among other things, that McCabe had failed to provide a safe workplace.  See McCabe Motion at 18; Ex. 17 (attached to McCabe Motion).  The state court granted summary judgment to McCabe, concluding that McCabe had not been at fault with respect to the assault by Perry.  See McCabe Motion at 19-20; Ex. 19 (attached to McCabe Motion).  McCabe contends that the state court's findings have preclusive effect under the collateral estoppel doctrine.  Because the Arbitrator addressed claims and legal theories different from those raised in the state suit, this court does not apply the collateral estoppel doctrine.

In late 1998, McCabe offered to reinstate Tahara as a longshore laborer with no seniority, leaving the issue of seniority for arbitration.  McCabe Motion at 20.  In December 1998, the NLRB, with the parties' agreement, deferred the issues raised in Tahara's 1998 ULP to arbitration, summarizing the deferred issues in a letter ("NLRB Deferral Letter"):

> On December 10, 1998, counsel for McCabe
> informed this office that the Employer is
> willing to participate in an arbitration
> hearing at which the following issues

6

> encompassed by the charge will be decided:
> (1) the seniority to which Quentin Tahara is
> entitled; (2) whether Quentin Tahara is
> entitled to receive backpay and benefits, and
> if so, the amount of backpay and benefits to
> which Tahara is entitled; and (3) the
> position(s) or job classification(s) to which
> Tahara should be reinstated.

Ex. 10 (attached to Union Motion) at 1.

In 1999, the parties participated in arbitration proceedings.  The arbitration began with a discussion of the issues that were to be arbitrated.  The Union cited section 18, which concerned workplace safety, although this section had not been noted in the May 1998 Grievance.  McCabe lodged an objection to the addition of CBA violations not originally identified, but the parties ultimately agreed to let the Arbitrator formulate the issues.  Ex. 1 (attached to Union Motion) at 8-9, 15.

In July 1999, the Arbitrator announced a decision (the "1999 Award"), which was accompanied by a cover letter.  Ex. 26 (attached to McCabe Motion).  The cover letter contained expressions of sympathy for Tahara and frustration that the parties had not settled the matter.  See id. at 1 ("Well, the parties couldn't settle this mess and looked to the Arbitrator to pull respective irons out of the fire and render a Solomon's judgment.  So you are receiving that judgment, with a vengeance!").

In the actual award, the Arbitrator addressed the issues of McCabe's liability, explaining that to determine which

7

position Tahara should be returned to, as well as his seniority and backpay, the Arbitrator had to clarify Tahara's 1994 leave of absence status and his 1994 transfer from the Longshore Unit to the Wharf Clerk Unit.  Id. at 8, 12.  The Arbitrator determined that McCabe had wrongfully refused to reinstate Tahara and that he should be returned to the Longshore Unit.  The Arbitrator then turned to the remedy issue, counseling the parties to attempt to resolve the matter by restoring Tahara "to as good a position as he was [in] before the Perry assault" so as to make him "completely whole."  Id. at 16-17.

The Union and McCabe negotiated in an attempt to achieve what the Arbitrator had counseled, but they were unable to reach an agreement as to the remedy.  The Arbitrator then issued an Advisory Clarification ("Advisory") on January 14, 2000. Ex. 27 (attached to McCabe Motion), stating that the 1999 Award was based in part on McCabe's unsafe working environment, a violation of section 18.02 of the CBA.  Id. at 3.  The Arbitrator referred to both McCabe's failure to prevent the Perry assault, as well as to McCabe's continued employment of Perry following the assault.  See id.

McCabe and the Union eventually returned to arbitration before the same Arbitrator in March 2006, this time to resolve the remedy issue.  For these hearings, the parties submitted a Stipulation that included four different calculations of backpay

dating back to 1994.  Ex. 29 (attached to McCabe Motion).  McCabe emphasized that by submitting the Stipulation, it was not conceding that it was liable for backpay all the way back to 1994.  Id. at 1.  Also at the hearing, McCabe argued and presented evidence on the following issues:  the Union's failure to grieve any 1994 violation, the untimeliness of any grievance of a 1994 violation, and the inapplicability of section 18.02's safety provisions to workplace violence.  Ex. 1 (attached to McCabe Motion) at 73-77.

On June 22, 2006, the Arbitrator issued his Supplemental Decision and Award ("Supplemental Award") setting forth damages McCabe owed Tahara.  Ex. 30 (attached to McCabe Motion) at 3.  The Supplemental Award awarded backpay dating back to March 30, 1994.  See id. at 3-7.

On June 26, 2006, the Arbitrator issued a "Tahara Post Mortem" ("Post Mortem"), which further clarified the bases for his decision.  Ex. 13 (attached to Union Motion).

> Grievant's employment and seniority status as a disabled employee commenced and related back to the March 30, 1994 work-related Perry assault which inflicted and created his permanent disability status, which caused and led to his subsequent work transfer to the Wharf Clerk Unit and the leave of absence hiatus necessitated by the [Witness Protection Program] and his personal safety concerns, all of which later led to and gave rise to disputed questions concerning his seniority and employment status.  The remedial period in this case must necessarily date back to the March 30, 1994 incident.

9

Id. at 2.

McCabe now moves to vacate the Arbitrator's Award, arguing that the Arbitrator's decision failed to draw its essence from the CBA or, alternatively, exceeded the scope of the parties' submissions.  McCabe focuses on the award of backpay dating back to 1994.  McCabe also moves to correct alleged calculation errors in the Arbitrator's Supplemental Award.  The Union moves to confirm the award and, in addition, requests prejudgment interest.  Because the court concludes that the Arbitrator's decision drew its essence from the CBA and that he did not exceed the scope of issues submitted, the court denies McCabe's motion and confirms the arbitration award for the most part.  The court remands the award in part only for clarification by the Arbitrator of his backpay calculation.  The court declines to award prejudgment interest.

III.    LEGAL STANDARD.

The court's review of arbitration awards is extremely limited, and courts give such awards great deference.  See Haw. Teamsters & Allied Workers Union, Local 996 v. United Parcel Serv., 241 F.3d 1177, 1180 (9th Cir. 2001) ("Our review of labor arbitration awards is, however, extremely deferential because courts do not sit to hear claims of factual or legal error by an arbitrator as an appellate court does in reviewing decisions of lower courts." (internal citations and quotations omitted));

Stead Motors of Walnut Creek v. Auto. Machinists Lodge No. 1173, 886 F.2d 1200, 1205 (9th Cir. 1989) (en banc) (stating that federal courts give a "nearly unparalleled degree of deference" to arbitrators' decisions).  An arbitration award is entitled to great deference

> [b]ecause the parties have contracted to have
> disputes settled by an arbitrator chosen by
> them rather than by a judge, [and] it is the
> arbitrator's view of the facts and of the
> meaning of the contract that they have agreed
> to accept.  Courts thus do not sit to hear
> claims of factual or legal error by an
> arbitrator as an appellate court does in
> reviewing decisions of lower courts.

United Paperworkers Int'l Union, AFL-CIO v. Misco, Inc., 484 U.S. 29, 37-38 (1987).

The Ninth Circuit has described this court's review of arbitration awards pursuant to a CBA as follows:

> Section 301 of the Labor Management Relations
> Act authorizes the district courts to enforce
> or vacate an arbitration award entered
> pursuant to a collective bargaining
> agreement.  However, judicial review of an
> arbitration award is both limited and highly
> deferential.  Thus, the court may not review
> the merits, but must ask only whether the
> grievance is governed by the contract and
> whether the parties agreed to arbitrate the
> dispute.  As long as the award "draws its
> essence" from the contract, meaning that on
> its face it is a plausible interpretation of
> the contract, then the courts must enforce
> it.  The arbitrator's interpretation of the
> scope of issues submitted to him is entitled
> to the same deference.

Sheet Metal Workers' Int'l Ass'n Local Union No. 359 v. Madison
Indus., Inc. of Ariz., 84 F.3d 1186, 1190 (9th Cir. 1996)
(internal citations omitted).  See also Major League Baseball
Players Ass'n v. Garvey, 532 U.S. 504, 509 (2001) (per curiam)
("Courts are not authorized to review the arbitrator's decision
on the merits despite allegations that the decision rests on
factual errors or misinterprets the parties' agreement.  We
recently reiterated that if an arbitrator is even arguably
construing or applying the contract and acting within the scope
of his authority, the fact that a court is convinced he committed
serious error does not suffice to overturn his decision.  It is
only when the arbitrator strays from interpretation and
application of the agreement and effectively dispenses his own
brand of industrial justice that his decision may be
unenforceable." (internal quotations and citations omitted)).

        "As long as the arbitrator's award 'draws its essence'
from the collective bargaining agreement, it must be enforced."
Sunshine Mining Co. v. United Steelworkers of Am., AFL-CIO, CLC,
823 F.2d 1289, 1293 (9th Cir. 1987).  In other words, this
court's "task is to determine whether the arbitrator interpreted
the collective bargaining agreement, not whether he did so
correctly."  Haw. Teamsters, 241 F.3d at 1178.

        The Ninth Circuit has recognized only three narrow
exceptions to the general rule of deferring to an arbitrator's

12

decision: 1) when the arbitrator's award does not draw its essence from the CBA; 2) when the arbitrator exceeds the boundaries of the issues submitted to him; and 3) when the award is contrary to public policy.   United Food & Commercial Workers Int'l Union, Local 588 v. Foster Poultry Farms, 74 F.3d 169, 173 (9th Cir. 1995).

IV.    ANALYSIS.

McCabe argues that the Arbitrator's decision to award backpay dating back to 1994 does not draw its essence from the CBA because the Arbitrator allegedly ignored the plain language of the CBA and dispensed his own brand of justice.  McCabe also argues that the Arbitrator's decision exceeded the scope of the submissions to which the parties agreed.  Lastly, McCabe claims that the Arbitrator made calculation errors in the Supplemental Award and that the court should correct the errors.  The Union disagrees and asks for prejudgment interest.

The court concludes that the Arbitrator did not ignore the plain language of the CBA and instead plausibly interpreted the CBA, not basing the Award on his own sense of justice.  The court also concludes that the Arbitrator did not exceed the scope of the issues submitted to him by the parties.  All the issues decided were either agreed to or implicit in the explicit submissions.

13

The court bases its decision on all the documents issued by the Arbitrator--the 1999 Award and its accompanying cover letter, the 2000 Advisory, the 2006 Supplemental Award, and the 2006 Post Mortem. "Although an arbitrator is not required to make formalized findings nor to offer reasons for his decisions, when he does so, we need not ignore them." American Postal Workers Union v. United States Postal Service, 682 F.2d 1280, 1285 (9th Cir. 1982) (citing Enterprise Wheel & Car Corp., 363 U.S. at 597 (1960)). This court considers all documents or statements that clarify the reasoning behind the Arbitrator's decisions. Id. (declining a party's request that the court not consider a document issued by the arbitrator setting forth certain findings).

A.   The Arbitrator's Decision Draws Its Essence from the CBAs.

An arbitrator's award draws its essence from the contract so long as the arbitrator is even arguably construing or applying the contract. Eastern Associated Coal Corp. v. United Mine Workers of America, Dist. 17, 531 U.S. 57, 62 (2000). If the arbitrator's award "represents a plausible interpretation of the contract, judicial inquiry ceases and the award must be enforced." George Day Constr. Co. v. United Bhd. of Carpenters, 722 F.2d 1471, 1477 (9th Cir. 1984). By contrast, an arbitrator's award does not draw its essence from a CBA in "those egregious cases in which a court determines that the arbitrator's

14

award ignored the plain language of the contract."   <u>Stead Motors</u>
<u>of Walnut Creek v. Automotive Machinists Lodge No. 1173, Int'l</u>
<u>Assoc. of Machinists and Aerospace Workers</u>, 886 F.2d 1200, 1206-
06 n.6 (9th cir. 1999).

        1.    The Arbitrator Did Not Ignore the Plain
              <u>Language of the CBA.</u>

      McCabe argues that the Arbitrator ignored the plain
language of the CBAs because the Arbitrator ordered an award for
an alleged violation that was never timely grieved, that failed
to satisfy the requirements of the grievance procedure set forth
in section 24.02 of the 1996-99 CBA, and that was beyond the
Arbitrator's remedial authority provided for in the CBA.  McCabe
contends that, in arbitrating the 1998 Grievance, the Arbitrator
had no authority to remedy a 1994 safety violation, because doing
so violated the CBA's requirement that grievances be filed within
fourteen days of the incident being grieved.  McCabe views the
1994 breach as never having been grieved, given the Union's
alleged failure to satisfy the requirement in section 24.02 of
the CBA that all grievances be stated in detail at each step of
the grievance procedure.  McCabe also notes that, under the CBAs,
remedies were waived for matters not timely grieved.  Lastly,
McCabe argues that the Arbitrator failed to recognize that the
safety provisions contained in section 18.02 were inapplicable to
workplace violence.

15

This court has reviewed Ninth Circuit decisions reviewing arbitrator's interpretations of CBAs.  In Sprewell v. Golden State Warriors, 266 F.3d 979 (9th Cir. 2001), the CBA authorized "disciplinary action for just cause by [a basketball player's] Team or by the Commissioner."  Id. at 986 (emphasis added).  The arbitrator read the word "or" as permitting dual punishment by both the player's team and the Commissioner.  The player argued that the arbitrator's decision did not draw its essence from the CBA because the arbitrator disregarded the "plain and unambiguous" language of the CBA.  The Ninth Circuit disagreed and looked to the arbitrator's explanation of why he read "or" in the conjunctive rather than disjunctive.  In acknowledging the irrelevance of whether the court would have reached the same conclusion, the court deferred to the arbitrator, whose explanation demonstrated that, "at the very least," he was arguably construing the contract.  See id. at 987.

Similarly, in Haw. Teamsters, the CBA provided that employees were not to be discharged without written notice but listed seven situations that were dischargeable offenses not requiring written notice.  Haw. Teamsters, 241 F.3d at 1179.  The arbitrator interpreted the list as nonexclusive and concluded that the employee's conduct, which did not fall into any of the seven offenses listed, was nonetheless a dischargeable offense not requiring written notice.  Id. at 1180.  The Ninth Circuit

16

affirmed the district court's confirmation of the arbitration award, despite a challenge that the arbitrator's award did not draw its essence from the CBA because the arbitrator ignored the language of the CBA.  Id. at 1183.  The court acknowledged that the list could "arguably be construed" as an exclusive list, but declined to question the merits of the arbitrator's interpretive method.  Id. at 1182, 1184.

On the other hand, the Ninth Circuit has determined that an arbitrator's award does not draw its essence from the CBA when the arbitrator makes a specific finding, but then declines to apply the consequences mandated by the CBA.  In United Food & Commercial Workers Union, Local 1119 v. United Markets, Inc., 784 F.2d 1413 (9th Cir. 1986), the CBA provided that an employer found to have twice violated a certain provision regarding employment classifications was "no longer" entitled to use a "General Clerk" classification.  Id. at 1414.  The arbitrator concluded that the employer had violated the provision on two occasions but permitted the employer to continue using the General Clerk classification.  The arbitrator further stated that the employer would lose the classification only after a third violation.  Id.  The Ninth Circuit affirmed the district court's decision to vacate the award, concluding that the arbitrator's award did not draw its essence from the CBA.  First, the Ninth Circuit disagreed with the employer's argument that nothing in

17

the CBA required the employer to withdraw the General Clerk
classification because, as the court noted, the phrase "no
longer" meant that the employer was not entitled to use of the
classification upon a finding of two violations.  Second, the
court looked to the arbitrator's statement that a third violation
by the employer would result in the loss of use of the
classification.  The court noted that this was in "direct
conflict" with the CBA, which provided that two violations would
result in loss of the classification.  Id. at 1415-16.

    Similarly, in Wyandot, Inc., v. Local 227, United Food
and Commercial Workers Union, 205 F.3d 922, 926 (6th Cir. 2000),
the court vacated the arbitrator's award when the arbitrator made
a specific finding on timeliness but decided not to apply the
grievance timelines mandated by the CBA.  Although the arbitrator
recognized that the grievant "did not meet the time limits set
forth in the Agreement," the "Arbitrator deemed the Agreement
deadlines inapplicable."  The court concluded that the
arbitrator's decision failed to draw its essence from the CBA.

    The Arbitrator here did not ignore the plain language
of the CBAs.  In contrast to the arbitrators in United Food and
Wyandot, the Arbitrator here did not reach conclusions
inconsistent with his rulings.  The Arbitrator did not, for
example, conclude that Tahara's grievance was untimely.  In fact,
the Arbitrator explained that his decision was based, in part, on

18

McCabe's continuing violation of section 18 through its continued employment of Perry.  See Post Mortem at 2-4.  If the 1994 safety violation was a continuing violation, Tahara's grievance was timely because he filed it within fourteen days from the last occurrence of a continuing violation.  See Sheet Metal Workers' Int'l Assoc. Local Union No. 359 v. Madison Industries, Inc., 84 F.3d 1186, 1191 (9th Cir. 1996) (confirming the arbitrator's decision and concluding that the grievance was not time-barred because, although it made reference to events occurring beyond the grievance period, it also included events that fell within the grievance period).

The 1998 Grievance admittedly listed two dates—April 6 and April 20, but the grievance was not filed until May 1, 1998. Although the April 6 incident did not fall within the CBA's fourteen-day requirement, McCabe did not object to the inclusion of the April 6 incident in the 1998 Grievance.  Even had McCabe objected, the Arbitrator could have plausibly interpreted the 1998 Grievance as encompassing a continuing violation that began in 1994 and included, but did not end with, the events of April 1998.  Contrary to ignoring the plain language of the CBAs, the Arbitrator clearly interpreted the CBAs by noting the existence of a continuing violation, which would not be time-barred under the CBAs.

McCabe notes that the Arbitrator provided multiple theories of McCabe's 1994 breach.  The court agrees with the Union that the multiple theories do not provide a sufficient basis for vacating the Arbitrator's decision.  <u>See</u> Union Reply at 5 (citing <u>Enterprise Wheel & Car Corp.</u>, 363 U.S. at 597-98).

McCabe also argues that, in ordering a remedy for the alleged continuing violation, the Arbitrator ignored the CBA's express requirement that grievances must be stated in detail at each step of the grievance procedure.  McCabe takes issue with the Union's failure to specify an alleged 1994 safety violation in either the 1998 Grievance or the 1998 Notice of Arbitration.  Although section 24.09 does require grievances to be stated in detail, it does not specify how this requirement must be satisfied.  <u>See</u> 1996-99 CBA at 23.  Thus, the Arbitrator could have plausibly concluded that section 24.09 was satisfied by the broad language of the Union's 1998 Grievance and Notice of Arbitration, as well as the Union's citation to section 18 at the 1999 hearing.  Moreover, the Arbitrator had before him the deferred ULP charge, which specifically mentioned the issue of backpay.  Significantly, unlike the arbitrators in <u>United Food</u> and <u>Wyandot</u>, the Arbitrator here never concluded that the 1994 violation had been inadequately pled through the grievance procedure.  Instead, by considering the alleged 1994 safety violation, the Arbitrator impliedly found that the grievance

complied with the CBAs.  If the Arbitrator had expressly

concluded that the grievance did not comply with the grievance

requirement and nevertheless decided the issue, he might be said

to have ignored the plain language of the CBAs.  See United Food,

784 F.2d at 1415.  But that did not happen.  This court cannot

say that the Arbitrator's reading of section 24.09 was

implausible.

Alternatively, rather than concluding that the Award

remedied a continuing violation, the Arbitrator could have

concluded that a remedy dating back to 1994 was an appropriate

remedy for McCabe's 1998 violation of the CBA, which was timely

grieved.  The Supreme Court has held:

> When an arbitrator is commissioned to
> interpret and apply the collective bargaining
> agreement, he is to bring his informed
> judgment to bear in order to reach a fair
> solution of a problem.  This is especially
> true when it comes to formulating remedies.
> There the need is for flexibility in meeting
> a wide variety of situations.

United Steelworkers of America v. Enterprise Wheel & Car Corp.,

363 U.S. 593, 597 (1960).  See also Sheet Metal Workers' Int'l

Assoc., 84 F.3d at 1191 (concluding that an arbitrator has the

authority to award backpay even though neither party requested

it).

McCabe notes the CBAs provide for a waiver of any

remedy when a matter is not timely grieved.  But the Arbitrator

could have concluded that the Arbitration Award was the

appropriate remedy for the way in which McCabe had handled
Tahara's attempt to return to work in 1998, and not for McCabe's
alleged 1994 violation.  The Arbitrator could have found that,
under the circumstances of the case, McCabe's refusal in 1998 to
reinstate Tahara was so unreasonable that it justified a remedy
dating back to 1994.  Given the broad remedial authority afforded
arbitrators and the absence of any express limitation on this
authority in the CBAs, the court concludes that the Arbitrator's
award drew its essence from the CBAs.

        The court also finds plausible the Arbitrator's
determination that section 18 was not limited to "industrial
safety and accident prevention."  The Ninth Circuit has cautioned
that "[i]t is not the district court's function to choose among
various interpretations of a contract as long as the arbitrator's
interpretation is plausible."  Desert Palace, Inc., v. Local
Joint Executive Board of Las Vegas, 679 F.2d 789, 793 (9th Cir.
1982).  In Desert Palace, the arbitrator concluded that certain
performances, for which tickets were sold through the Ticketron
system, qualified as "special events" under a CBA.  The district
court vacated the arbitrator's award based on its own
interpretation of three terms--"arranged," "food and/or
beverage," and "special"--that the court believed were plain and
unambiguous.  The Ninth Circuit reversed, concluding that the
contract terms were ambiguous and that the arbitrator's

interpretations were plausible.  <u>Id.</u> at 792-93.  Similarly, section 18 is subject to interpretation as to whether it covers workplace violence.  The Arbitrator, in considering testimony and other company policies, interpreted section 18 as covering workplace violence.  Because the Arbitrator's interpretation is plausible, the court's inquiry ends.

To sum up, the Arbitrator did not ignore any express provision of the CBAs, and his interpretations of the CBAs were plausible.  The court therefore concludes that the Arbitrator's decision did not fail to draw its essence from the CBAs.

2.    The Arbitrator Did Not Base His Decision On
      His Personal Sense of Justice.

McCabe contends that the Arbitrator dispensed his own brand of justice.  In support of this argument, McCabe cites to the cover letter accompanying the 1999 Award, in which the Arbitrator expressed sympathy with Tahara's situation (noting that Tahara should have received a "hero's welcome") and stated that the parties were receiving a judgment "with a vengeance!" McCabe Motion at 36.  However, the Arbitrator's expressions of sympathy and anger are an insufficient basis for vacating his award.

In <u>Haw. Teamsters</u>, the Ninth Circuit clarified that whether an arbitrator "dispense[d] his own brand of industrial justice" does not constitute an independent ground for vacating an arbitrator's award.  It is simply another formulation of the

23

general rule that an arbitrator must base his decision on a plausible interpretation of the CBA.  See Haw. Teamsters, 241 F.3d at 1183 (citing Garvey, 363 U.S. at 597).  An arbitrator's sympathetic expressions, standing alone, are not grounds for vacating an arbitration award.  Instead, these expressions are just one factor in determining whether an arbitrator's decision failed to draw its essence from a CBA.  See, e.g., First National Supermarkets, Inc., v. Retail, Wholesale & Chain Store Food Employees Union Local 338, 118 F.3d 892, 897 (2d Cir. 1997) (concluding that an arbitrator's award did not fail to draw its essence from the CBA just because he referred to concepts of mercy, pity, and compassion).  The Arbitration Award drew its essence from the CBAs.

> B.   The Arbitrator's Decisions Do Not Exceed The Scope
>      of Issues Submitted.

An arbitrator's ruling can be vacated if the ruling "exceeds the boundary of the submission to him." La Mirada Trucking v. Teamsters Local Union 166, 538 F.2d 286, 288 (9th Cir. 1976).  "The scope of the arbitrator's jurisdiction extends to issues not only explicitly raised by the parties, but all issues implicit within the submission agreement." Schoenduve Corp. v. Lucent Technologies, 442 F.3d 727, 733 (9th Cir. 2006). An arbitrator's interpretation of the scope of the issues submitted is entitled to great deference.  See Pack Concrete Inc. v. Cunningham, 866 F.2d 283, 285 (9th Cir. 1989) ("We now hold

that an arbitrator's interpretation of the scope of the issue submitted to him is entitled to the same deference accorded his interpretation of the collective bargaining agreement."); <u>see also</u> <u>Ghebreselassie v. Coleman Security Service</u>, 829 F.2d 892, 897 (9th Cir. 1987).

McCabe argues that the Arbitrator exceeded the scope of the formal submissions by finding a 1994 safety violation because the submissions in the 1998 Grievance focused solely on the April 1998 termination.  McCabe Motion at 39.  The Union responds that McCabe agreed to allow the Arbitrator to define the issues submitted, and that the NLRB deferral letter expanded the scope of the issues to include those stated in the ULP charge, which relate to Tahara's allegations that McCabe failed to provide a safe working environment.  Union Motion at 38-39.  The Union further contends that the 1994 violation was implicit in the April 1998 discharge:

> Implicit in the May 1998 Grievance and the ULP as well as the parties' submissions at the 1999 Hearing was the history of Mr. Tahara's experiences beginning in March 1994. To assess the nature of McCabe's failure to reinstate Mr. Tahara in 1998, Arbitrator Tsukiyama had to inquire into the nature of Mr. Tahara's leave of absence and his transfer from the Longshore Unit to the Wharf Clerk Unit, both of which implicated the March 1994 assault and its consequences.

<u>Id.</u> at 40.

25

The Ninth Circuit has concluded that an arbitrator "necessarily ha[s] the authority to decide . . . those issues [that] were implicit within the submission agreement." Schoenduve, 442 F.3d at 732.  In Schoenduve, the claim submitted for arbitration was broad, seeking damages arising from the wrongful conduct of the appellant Lucent, based on breach of contract and other claims, including Lucent's failure to account for monies owed to the appellee Schoenduve.  Id. at 732.  Lucent did not object to the broad language of the submitted claim.  The arbitrator ultimately concluded that Lucent's wrongful conduct was not covered by the contract, but ordered recovery for Schoenduve based on theories of quasi-contract.  Lucent sought to vacate the arbitration award and argued that no quasi-contract issue fell within the scope of the submissions.  The Ninth Circuit, affirming the district court's confirmation of award, concluded that the quasi-contract issue "necessarily arose" in Schoenduve's demand for commissions owed.  Id. at 733.  The court noted the broad deference granted to an arbitrator's interpretation of the scope of the issues submitted.  The court also concluded that Lucent's minor references to the issue of quasi-contract in its summary judgment letter and opening statement were evidence that Lucent had had a sufficient opportunity to argue its position with regard to the quasi-contract issue.  Id. at 734 & n.6.  See also Ghebreselassie, 829

F.2d at 898 ("[T]he arbitrator's decision to deny the grievance on [an implicit issue] was not improper where, as here, both parties argued this issue before the arbitrator and neither objected to the introduction of evidence bearing on this issue.").

In Michigan Mutual Insurance Co. v. Unigard Security Insurance Co., 44 F.3d 826, 829 (9th Cir. 1995), the issue before the arbitration panel was rescission or, alternatively, enforcement of a reimbursement contract.  The arbitration panel directed reimbursement subject to certain conditions precedent. The appellant sought to vacate the award, arguing that the issue submitted for arbitration was only whether the reimbursement contract could be rescinded or enforced and that the arbitration decision exceeded the scope of the submissions.  The court disagreed, concluding that the conditions of reimbursement were implicit in the submission: "although neither party specifically addressed this question in its submission to the panel . . . the parties must have been aware that an award of partial relief would put the question before the panel."  Id. at 830.  See also Federated Dep't Stores v. United Food & Commercial Workers Union, Local 1442, 901 F.2d 1494, 1498 (9th Cir. 1990) (concluding that, when the issue of just cause for an employee's discharge was explicitly before an arbitrator, the issue of due process in the employee's discharge was also implicitly before the arbitrator);

27

Ghebreselassie, 829 F.2d at 897-98 (holding that the issue of whether a grievance was timely filed was implicitly before an arbitrator who was explicitly determining remedy issues).

Here, the parties agreed to allow the Arbitrator to frame the issues. McCabe argues that the scope of the backpay award submitted to the Arbitrator was not agreed to. See McCabe Reply at 17. But even if the issue of backpay dating back to 1994 was not explicitly submitted to the Arbitrator, it was at least implicitly submitted. To evaluate the submitted issue of which unit Tahara would return to, as well as his seniority level, the Arbitrator may have needed to examine Tahara's 1994 transfer from the Longshore Unit to the Wharf Clerk Unit and the reasons for Tahara's leave of absence. These issues stemmed from a common source: safety concerns posed by McCabe's continued employment of Perry. The 1994 events clearly related to McCabe's refusal to reinstate Tahara in 1998. Thus, the Arbitrator, in issuing the Arbitration Award, was not seeking to remedy an unconnected and independent 1994 violation. Instead, the 1994 violation could have been considered part of a series of continuous events that ultimately led to McCabe's 1998 violation. The court therefore concludes that McCabe's 1994 violation was implicitly submitted to the Arbitrator.

The court also notes that, at the 2006 arbitration hearing, McCabe had an adequate opportunity to present evidence

and arguments concerning any alleged 1994 violation.  See
Schoenduve, 442 F.3d at 734 n.6 (noting that a party's brief
references to an issue in its opening statement and summary
judgment letter were sufficient to afford the party an
opportunity to argue the issue).

        In the related context of whether issues are even
subject to arbitration, the Ninth Circuit has concluded that an
issue falls within an arbitrator's authority to decide it once
the party has argued the merits of the issue.  Similarly, in
Tristar Pictures, Inc. v. Director's Guild of America, Inc., 160
F.3d 537, 539-40 (9th Cir. 1998), the appellant argued that the
arbitrator's award should be vacated because the agreement did
not give the arbitrator jurisdiction over the dispute at issue.
The court disagreed, concluding that, in arguing the merits of
the dispute, the appellant had "tacitly admitt[ed]" the
arbitrator's jurisdiction.  Id. at 540 ("Instead of resting on
its present contention that the arbitrator could not grant
[appellee] the relief he sought, [appellant] put on evidence
[regarding the merits of the dispute], tacitly admitting that it
was plausible for the arbitrator to assume jurisdiction over the
dispute.").  See also George Day Constr. Co., 722 F.2d at 1475
("In the instant action the employer, by conduct evinced clearly
its intent to allow the arbitrator to decide not only the merits
of the dispute but also the question of arbitrability.").

Notwithstanding its purported reservation of the right to challenge the Arbitrator's authority, McCabe, by submitting evidence and arguing the merits of the 1994 safety violation, must have understood that the Arbitrator could plausibly assert that he had the authority to decide this issue.  The court concludes that the Arbitrator's decision did not exceed the scope of the issues submitted.

C.   The Court Remands the Award for Clarification of the Backpay Calculation.

McCabe asks the court to at least correct two alleged calculation errors in the Arbitrator's Supplemental Award.  See McCabe Motion at 26-27, 42.  In calculating the backpay owed to Tahara, the Arbitrator employed a combination of the alternative methods set forth in the parties' Stipulation.  One of the methods involved referring to the earnings of another employee, Eseki Tupuola, whose seniority and employment positions were comparable to Tahara.

McCabe's first argument is that the Arbitrator erred by failing to credit back to McCabe the amount that Tahara's earnings exceeded Tupuola's for the period from June 1994 to May 1995.  The court is not persuaded that it should credit McCabe with any excess earnings.  The Arbitrator does not appear to have made a mere arithmetic error in this regard.  The Arbitrator clearly determined that "the net backpay" due for the period from June 6, 1994, to July 24, 1994 "should be zero."  But a

30

determination that no backpay would be awarded is not necessarily
a decision to credit an employer with excess earnings.  Whether
the Arbitrator intended to credit McCabe is unclear, and the
court denies McCabe's request for the court to insert itself into
the issue.  For this court to apply a credit would be improper
tampering with an arbitration award.

The second calculation error McCabe points to concerns
backpay for the period from July 25, 1994, to May 4, 1995.
Relying on figures the parties stipulated to, the Arbitrator may
have introduced calculation errors by double-counting Tupuola's
comparable pay from January 1 to May 4, 1995, and also by adding
in Tupuola's comparable pay from May 4 to December 31, 1995.  The
Arbitrator thereby came up with a calculation of Tupuola's
earnings that exceeded Tahara's when, in fact, the parties had
stipulated that Tahara had earned more than Tupuola during this
period.  As a result, the Arbitrator awarded Tahara $61,661.58
for the period.

The Stipulation set forth:  (1) Tupuola's pay from July
25 to December 31, 1994, (2) Tupuola's pay from January 1 to
December 31, 1995, and (3) Tupuola's pay from January 1 to May 4,
1995.  See Stipulation at 4.  The Arbitrator added up the three
amounts, which double-counted Tupuola's earnings from January 1
to May 4, 1995, and also added in earnings from May 5 to December
31, 1995.  See Supplemental Award at 7.  The Arbitrator appears

to have intended to include pay relating to the period from
May 5, 1995, to December 31, 1995, in calculating Tahara's
backpay for the entire period of his leave of absence (May 4,
1995 to December 31, 1998).  See Supplemental Award at 7 ("Thus,
the Method 1 earnings figure will be adopted for this calculation
yielding a net backpay figure for this 43-month period of
$249,183.37, plus earnings calculated for the missing May 4 to
December 31, 1995 period.") (emphases added).  However, the court
is uncertain what the Arbitrator's final backpay award was
intended to be, given the clear errors in calculation.

        Although McCabe urges this court to recalculate the
backpay, this court believes that any judicial recalculation
would be an impermissible intrusion by the court into the
arbitration process.  Given the complicated calculation at issue,
a judicial calculation would risk deviating from the Arbitrator's
intent.

        This court is without clear guidance on whether it
could correct even an obvious and simple error.  The Federal
Arbitration Act ("FAA") authorizes courts to correct an award
"[w]here there was an evident material miscalculation of
figures."  9 U.S.C. § 11(a).  In 2001, the Supreme Court, in
Circuit City Stores, Inc. v. Adams, 532 U.S. 104, 119 (2001),
concluded that employment contracts dealing with transportation
workers were exempted from the FAA.  However, it is unclear

whether the FAA applies to CBAs.  Neither the Supreme Court nor

the Ninth Circuit has expressly addressed this point.  In

Poweragent Inc., v. Electronic Data Systems Corp., 358 F.3d 1187,

1193 (9th Cir. 2004), the Ninth Circuit noted that Circuit City

had not specifically addressed CBAs and itself declined to

determine whether the FAA applied to CBAs.  Id. at n.1.[1]

        Given the lack of governing appellate law as to whether

the FAA applies here to permit correction of the Arbitrator's

arithmetic error, as well as the complicated nature of any

purported "correction," this court decides to remand the matter

to the Arbitrator for the limited purpose of reexamining the

calculation of backpay back to 1994.  This remand includes both

the issue of any credit to McCabe for Tahara's earnings in excess

of Tupuola's and the issue of the total amount of backpay.

        The court recognizes that this might be a non-FAA case,

and that remand in the non-FAA context is generally discouraged.

McClatchy Newspapers v. Central Valley Typographical Union No.

46, 686 F.2d 731, 734 (9th Cir. 1982).  Even in McClatchy,

---

        [1] But see id. at 1193.  In Poweragent, the Ninth Circuit was
deciding whether the judicial estoppel doctrine applied to an
arbitration governed by the FAA.  The court looked to Tristar,
160 F.3d 537, a pre-Circuit City CBA arbitration.  At the time of
the Ninth Circuit's consideration of the matter, Tristar appeared
not to be governed by the FAA.  Tristar had held that judicial
estoppel did apply.  The Ninth Circuit concluded in Poweragent
that judicial estoppel did apply to the case before it, which,
unlike Tristar (at least at the time Tristar was decided), was
covered by the FAA.

however, the court noted the circumstances under which remand
would be appropriate, and the case before this court falls under
one of those exceptions:

> The principles that an arbitration award once
> rendered is final has been held to contain
> some limitations.  It has been recognized in
> common law arbitration that an arbitrator can
> correct a mistake which is apparent on the
> face of his award, complete an arbitration if
> the award is not complete, and clarify an
> ambiguity in the award.

Id. at 734 n.1.

This court is acutely aware that it has before it an
extremely longrunning dispute that had its genesis in 1994 and
that yielded arbitration rulings dating back to 1999.  Conscious
that the very purpose of arbitration is to provide a speedy and
efficient resolution of a dispute, this court would, if it could,
correct an obvious arithmetic error.  The FAA permits correction
of a calculation error, but, whether the FAA applies or not, any
"correction" here would be far from simple or arithmetic.  No
controlling authority appears to prohibit a remand.

In an attempt to minimize any delay that even a limited
remand would cause, the court will conclude the present case with
this ruling.  Any action to confirm or vacate the award the
Arbitrator issues on remand should be brought to this court by
commencing a new civil action.  Any party commencing such a new
action is directed to inform the Clerk of Court that the new
action is related to the present case and therefore should be

34

assigned to the same district judge.  The court waives the filing

fee for commencing a new action relating to the Arbitrator's

award on remand.  Any party commencing a new action with respect

to an arbitration award on remand should, at the time of such

commencement, provide the Clerk of Court with a copy of this

order to obtain the benefit of the filing fee waiver.

> D.   No Prejudgement Interest Is Awarded.

The Union asks for prejudgment interest from the

Supplemental Award dated June 22, 2006.  The court, in its

discretion, declines the request.

"Interest shall be allowed on any money judgment in a

civil case recovered in a district court."  28 U.S.C. § 1961(a).

Section 1961 applies to the confirmation of an arbitration award.

See Citicorp Real Estate, Inc. v. Smith, 155 F.3d 1097, 1107-08

(9th Cir. 1998).  An award of interest in this kind of case is

wholly within the discretion of this court.  See Chrysler Motors

Corp. v. Int'l Union, Allied Industrial Workers of America, 959

F.2d 685, 689 (7th Cir. 1992); Int'l Ass'n of Bridge, Structural

& Ornamental Iron Workers, Local Union No. 103, AFL-CLO v. Higdon

Construction Co., Inc., 739 F.2d 280, 283 (7th Cir. 1984).

The Union argues that some federal courts rely on a

presumption in favor of prejudgment interest in the context of

arbitration award confirmations.  Defendant Opp'n at 45.  The

Union pays particular attention to Service Employees

International Union, Local 32 BJ, AFL-CIO v. Stone Park
Associates, 326 F. Supp. 2d 550, 555 (S.D.N.Y. 2004), in which
the district court noted that "district courts within the Second
Circuit have exercised their discretion to award prejudgment
interest when confirming arbitration awards under collective
bargaining agreements pursuant to § 301 of the LMRA, when the
CBAs indicated that an arbitration award was 'final and
binding.'" Stone Park, 326 F. Supp. 2d at 555. Stone Park found
the award of prejudgment interest consistent with Waterside Ocean
Navigation Co., v. International Navigation Ltd., 737 F.2d 150,
154 (2d Cir. 1984). But that decision did not actually award
prejudgment interest. Instead, the Second Circuit decided only
that there was a presumption that prejudgment interest was
available in the context of foreign arbitration awards. Id. at
153-54. This assertion simply supports the general notion that
the granting of prejudgment interest is in the discretion of the
trial court. When the district court in Stone Park granted
prejudgment interest, it relied on the "final and binding" clause
in the CBA, as well as on the lack of objection to prejudgment
interest. Id.

          This court has not found, and the parties have not
provided, any Ninth Circuit or Supreme Court opinion that applies
a presumption that prejudgment interest should be awarded in the
context of arbitration awards. Accordingly, the court relies on

the general standard articulated by the Ninth Circuit with respect to prejudgment interest awards: "Whether interest will be awarded is a question of fairness, lying within the court's sound discretion, to be answered by balancing the equities." Wessel v. Buhler, 437 F.2d 279, 284 (9th Cir. 1971); see also Landwehr v. DuPree, 72 F.3d 726, 739 (9th Cir. 1995) (quoting this standard in determining whether prejudgment interest should be awarded in an ERISA case). This court looks at "(i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court." Wichkham Contracting v. Local Union No. 3, IBEW, 955 F.2d 831, 834 (2d Cir. 1992) (citing Loeffler v. Frank, 486 U.S. 549, 557-58 (1988); Blau v. Lehman, 368 U.S. 403, 412 (1962)).

The Union argues that the "award of interest is necessary to make Mr. Tahara whole in light of the long and tortuous history of this case and the company's continuing refusal to remedy the situation." Union Reply at 18. In Chrysler Motors, 959 F.2d at 689, a union presented a similar argument when it claimed that "the denial of prejudgment interest improperly rewards [the employer] for its noncompliance with the arbitration award and that such interest is necessary to make [the employee] whole." The Seventh Circuit affirmed the district

37

court's decision declining to issue prejudgment interest, calling the union's reasoning "insufficient to support an award of prejudgment interest because it can be used any time an employer seeks review of an arbitration award . . . but is unsuccessful." Id.

This court concludes that the circumstances of this case do not warrant an award of prejudgment interest. The Arbitration Award was issued on June 23, 2006. Since then, the parties have been involved in concerted efforts to settle the matter. Further, McCabe's challenge to the arbitration award does not appear to have been a bad-faith attempt to evade payment of the award. See e.g., Brayton Purcell LLP v. Recordon & Recordon, 2007 WL 420122 at *10 (N.D. Cal. 2007) ("Taking into account these factors, the Court concludes that prejudgment interest in the instant case is not warranted. First, the Court does not find that there has been needless delay in this case as a result of Defendants' actions. Defendants, for instance, had a legitimate basis for arguing improper venue and likewise had a legitimate basis for arguing that they were not time barred from moving to vacate the arbitration award. Although the Court has rejected Defendant's arguments in favor of vacatur, it cannot say that Defendant's motions were unjustified.").

The Union does not even suggest that Tahara has suffered undue financial hardship while awaiting payment of the

award.   Accordingly, the court exercises its discretion to decline to award prejudgment interest.

V.          CONCLUSION.

        For the foregoing reasons, the court grants the Union's motion to confirm the Arbitration Award, remanding to the Arbitrator only the issue of the calculation of backpay to 1994, including the issue of credits back to McCabe, if any.  The court declines to award prejudgment interest.  In all other respects, McCabe's motion to vacate the Arbitration Award is denied.

        The Clerk of Court is directed to enter judgment for the Union stating that the Arbitration Award is confirmed but the backpay amount is remanded to the Arbitrator.


        IT IS SO ORDERED.

        DATED: Honolulu, Hawaii, March 31, 2008.




                              /s/ Susan Oki Mollway
                              Susan Oki Mollway
                              United States District Judge


McCABE HAMILTON & RENNY CO., LTD., v. INTERNATIONAL LONGSHORE AND WAREHOUSE UNION, LOCAL 142, AFL-CIO, Civ. No. 06-00514 SOM/LEK; ORDER CONFIRMING IN PART AND REMANDING IN PART ARBITRATION AWARD